*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2013 UT 68**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Plaintiff and Appellee,*

*v.*

RIQO MARIANO PEREA,
*Defendant and Appellant.*

No. 20100891
Filed November 15, 2013

Second District, Ogden Dep't
The Honorable Ernest T. Jones
No. 071901847

Attorneys:

John E. Swallow, Att'y Gen., Christopher D. Ballard, Asst. Att'y
Gen., Salt Lake City, for appellee

Samuel P. Newton, Kalispell, MT, for appellant

JUSTICE PARRISH authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING,
JUSTICE DURHAM, and JUSTICE LEE joined.

JUSTICE DURHAM filed a concurring opinion, in which
ASSOCIATE CHIEF JUSTICE NEHRING joined.

JUSTICE LEE filed a concurring opinion, in which
CHIEF JUSTICE DURRANT joined.

JUSTICE PARRISH, opinion of the Court:

### INTRODUCTION

¶1     Riqo Perea appeals from a conviction for two counts of
aggravated murder in violation of Utah Code section 76-5-202 and
two counts of attempted murder in violation of Utah Code section
76-5-203. Mr. Perea was sentenced to life without parole (LWOP) for
each aggravated murder conviction and three years to life for each
attempted murder conviction.

¶2     Mr. Perea raises numerous issues. He contends that the
district court erred by limiting and excluding the testimony of

defense experts, precluding the testimony of potentially exculpatory defense witnesses, and denying Mr. Perea's motion to suppress his confession. Mr. Perea further contends that the combination of errors constitutes cumulative error and requires reversal. Mr. Perea also argues that Utah Code section 76-3-207.7, which provides the sentencing scheme for first degree felony aggravated murder, is unconstitutional. He finally argues that we should require recording of confessions occurring at police stations.

¶3 We hold that the district court erred when it excluded the testimony of the defense's expert witnesses. But we conclude that the error was harmless and does not undermine our confidence in the verdict when viewed against the backdrop of Mr. Perea's overwhelming guilt. We also hold that section 76-3-207.7 is constitutional on its face and was constitutionally applied to Mr. Perea. We therefore affirm.

## BACKGROUND

¶5 On the evening of August 4, 2007, Mr. Perea, then nineteen years old, was spending time with friends. Mr. Perea and many of those with him belonged to the Ogden Trece gang. That night, Dominique Duran drove the group to the home of Christina Rivera in her maroon GMC Yukon (SUV). When the group arrived at Ms. Rivera's residence, Sarah Valencia, who had been left in charge of the residence, told the group they were not welcome.

¶6 When the group entered Ms. Rivera's house over Ms. Valencia's objections, she and a friend walked across the street to Anthony Nava's house. Mr. Nava was hosting a wedding party that included some members of the Norteños, a rival gang to the Ogden Trece. Before Ms. Valencia and her friend made it to Mr. Nava's house, Mr. Perea and the others followed them and an argument erupted. The argument led to an exchange of gang insults between Mr. Perea's group and some partygoers at Mr. Nava's, at which point an unknown person fired a shot in the air.

¶7 When the shot was fired, Mr. Perea and his group returned to Ms. Duran's SUV. Mr. Perea was seated in the front passenger seat. Ms. Valencia, who was standing near the street, testified that as the SUV pulled away, "I seen Riqo over the top, shooting." Similarly, Angelo Gallegos and Elias Garcia, passengers in the SUV, testified that Mr. Perea fired shots from the SUV as it pulled away from the party.

¶8     Ms. Valencia and her friend, Sabrina Prieto, were standing on a walkway between the front door and the carport of Mr. Nava's house when the shots rang out from the SUV. Ms. Valencia ran east along the front of the home toward the carport, and as she sought cover in a side door, she turned and saw Ms. Prieto fall on the doorstep. Ms. Prieto had been fatally shot through the right side of her chest.

¶9     Richard Esquivel, like many of the other witnesses, was facing the road when the shots from the SUV were fired. Mr. Esquivel testified that he saw someone from the passenger side of the SUV lean over the roof and fire towards Mr. Nava's house. After the first shot was fired, Mr. Esquivel got down but was hit in the back part of his shoulder and hip. Rocendo Nevarez, who was standing slightly closer to the road, was fatally shot in the lower left part of his back.

¶10    Keri Garcia was standing in Mr. Nava's driveway when the shots from the SUV were fired. She ran south along the side of the house, but was shot in the lower back as she sought cover. Ms. Garcia testified that the shots came only from the direction of the road.

¶11    Lacey Randall was standing beside her car, which was parked in Mr. Nava's driveway. As did the other witnesses, Ms. Randall testified that she saw the shooter sitting on the passenger side windowsill of the SUV. Ms. Randall was pulled to the ground just before a bullet struck the car window above her.

¶12    Mr. Gallegos, a passenger in the SUV, testified that when Mr. Perea climbed back into the vehicle after the shootings, Mr. Perea told them that "[i]f [they] said anything, there would be a bullet with [their] name on it." In contrast, Mr. Garcia, another passenger, testified that Mr. Perea "was confused," but "never threatened to put a bullet in anybody." Ms. Duran, who was driving, testified that Mr. Perea said, "[D]rive right and let's not get pulled over."

¶13    A short time later, Ms. Duran dropped off the group near a church in North Ogden. Mr. Garcia testified that later that morning, Mr. Perea dumped the gun in an alley. The gun was never recovered.

¶14    The bullets recovered from Ms. Prieto's and Mr. Navarez's bodies were .22 caliber and appeared to have been fired from the same gun. Police recovered ten expended .22 caliber shell casings in

the street in front of Mr. Nava's house. No other shell casings were found at the crime scene. While the State's ballistic expert determined that all of the casings were expended from the same gun, the expert was not able to determine if the gun that fired the bullets was the same gun that expended the casings.

¶15    While investigating the case, Detective John Thomas called Mr. Perea's cell phone. Detective Thomas explained that he needed Mr. Perea "to come into the police station, talk to [him]," and give the detective "[Mr. Perea's] version of what happened that night." Mr. Perea denied any involvement in the crime and then disconnected the call. When Detective Thomas called back, Mr. Perea stated that "he wasn't coming in yet, that he needed to speak with his lawyer first before he came in," and that "he got screwed the last time he spoke with cops and he was innocent."

¶16    Two days later, officers arrested Mr. Perea in Layton. They transported Mr. Perea back to Ogden and placed him in an interview room. Mr. Perea was allowed to use the bathroom, and when he returned, Detective Thomas read Mr. Perea his *Miranda* rights. Detective Thomas joked that Mr. Perea "had his rights read to him so many times that he could probably read them back to [him], and [Mr. Perea] kind of laughed and said, 'Yeah, probably.'" Officer Gent, who was standing outside the interview room, monitored the conversation via a closed-circuit television. Despite the fact that the closed-circuit television was equipped to do so, Officer Gent did not record the interview because it was the Ogden Police Department's policy not to record interrogations.

¶17    After providing Mr. Perea some water, Detective Thomas and Officer Gent began their questioning. Mr. Perea agreed to speak with the investigators and told them his version of the events the night of the shootings. Though the investigators told Mr. Perea that his story did not match that of other witnesses, the conversation remained calm and civil.

¶18    During the questioning, the investigators suggested that perhaps Mr. Perea fired the shots from the SUV because he was trying to protect Ms. Duran's children, who were in the back seat of the SUV. And in an attempt "to minimize the consequences of what [Mr. Perea] was looking at," Officer Gent suggested to Mr. Perea that he intentionally shot low or high, not intending to kill anyone. During this part of the questioning, Mr. Perea began to cry and though "he was tearing up and his eyes were welling up," Officer Gent testified that "it wasn't like [Mr. Perea] was full grown dis-

traught." When further questioned about whether he shot to protect the children, Mr. Perea stated that "as they drove off [in the SUV] he blacked out and he couldn't remember what happened."

¶19 The investigators told Mr. Perea that "it doesn't usually work out well" when people say they blacked out, and they encouraged Mr. Perea to tell the truth. Mr. Perea thereafter admitted to shooting from the SUV. When asked what kind of gun he fired, Mr. Perea stated that it was a .22 caliber, a fact the investigators had not previously disclosed.

¶20 After admitting to the shooting, Mr. Perea agreed to sign a typewritten confession. Officer Gent once again gave Mr. Perea a *Miranda* warning, and Mr. Perea again agreed to speak with the officers. Officer Gent then asked Mr. Perea open-ended questions about the shooting, to which Mr. Perea gave answers that "seemed appropriate for the question." Officer Gent testified that he transcribed Mr. Perea's statements "verbatim."

¶21 After Officer Gent completed the transcription, he printed the document and handed it to Mr. Perea for review. When Officer Gent asked Mr. Perea if he could read, "[Mr. Perea] laughed at [the officer] and said he could." Mr. Perea read the statement and signed where appropriate, including an acknowledgment that he voluntarily waived his *Miranda* rights. Officer Gent testified that he "[n]ever saw any indication that [Mr. Perea] was not understanding what [the investigators] were saying" and that Mr. Perea was attentive and responsive throughout the process. Officer Gent further testified that he never made any promises to Mr. Perea in exchange for his cooperation with the investigators.

¶22 The State charged Mr. Perea with two counts of aggravated murder and two counts of attempted murder. The State initially filed, and then withdrew, a notice of intent to seek the death penalty. Prior to trial, the district court made three substantive evidentiary rulings relevant to the issues raised on appeal.

¶23 First, the district court denied the State's motion to exclude the testimony of James Gaskill, the defense's crime scene reconstruction expert, who intended to testify that there were multiple shooters and that the State's conclusion that Mr. Perea fired all of the shots was not supported by the forensic evidence. The State argued that Mr. Gaskill's theories were not supported by the facts and that his anticipated testimony constituted an improper expression of opinion on the credibility of other witnesses. The district court held that Mr. Gaskill could testify regarding his conclusions about the sequence of

events on the night of the crime. And while the district court ruled that Mr. Gaskill could not comment on the credibility of other witnesses, it allowed him to "testify that based on his examination[,] he [did not] agree with what some of the witnesses testified to."

¶24   Minutes before the defense presented its case, the State renewed its motion to exclude Mr. Gaskill's testimony.  Citing foundational concerns, the State objected to the admission of two computer animations and a number of photographs Mr. Gaskill intended to use in support of his testimony.  After hearing testimony from Mr. Gaskill in support of the evidentiary foundation, the court excluded both animations and the photographic evidence.  It ruled that the photographs did not accurately depict the crime scene and it excluded the animation because "[Mr.] Gaskill can't lay any kind of a foundation for the animation here.  He didn't prepare it.  We don't know what went into it.  We don't know who was involved in [its creation]."  Although the court allowed Mr. Gaskill to testify at trial regarding his theories, it sustained the majority of the State's multiple objections when Mr. Gaskill's testimony commented directly on the credibility of other witnesses.

¶25   The district court's second relevant pretrial ruling involved the testimony of Dr. Richard Ofshe, a defense expert who intended to testify about the phenomena of false confessions and opine that Mr. Perea had falsely confessed.  The State argued that under rule 608 of the Utah Rules of Evidence, Dr. Ofshe could not testify "that [Mr. Perea's] confession was coerced" because "[t]hat is a legal conclusion . . . [a]nd that is for the [district court] to determine."  The State also argued that under rule 702, Dr. Ofshe's "research is sharply contested . . . [and] is not research that is generally accepted within the scientific community in which he operates."  Finally, the State argued that under rule 403, Dr. Ofshe's testimony would be more prejudicial than probative.

¶26   The defense responded by noting that the parties were not before the court "on a *Rimmasch* hearing" and argued that the district court had "appointed [Dr. Ofshe] as an expert." The defense continued, stating that "[w]e're asking that [Dr. Ofshe] be able to testify as an expert and ask for some sort of *Rimmasch* [hearing] that could show that he's not reliable," otherwise, "I think that it would be incumbent upon the Court to allow his testimony." The defense argued that Dr. Ofshe had testified in over one hundred cases nationwide, that this court had cited to Dr. Ofshe's work in two

opinions,[1] and that his expert testimony would assist the jury and should therefore be admitted.

¶27   The district court reasoned that a jury of lay people could determine a confession's voluntariness. It also expressed concern that it

> ha[d] previously ruled that Defendant's confession was voluntary. Dr. Ofshe's proposed testimony that Defendant's [confession] was coerced is a legal conclusion previously rejected by the Court and invades the fact finding function of the jury. . . . [Further,] Dr. Ofshe's conclusions do not meet the *Rimmasch* standard because they are based upon principles not generally accepted within the scientific community.

The district court did not "allow Dr. Ofshe to testify either in generalities about coerced confessions or about the confession in this particular case." The district court noted, however, that "the defense [could] develop their theory of whether it was a coerced confession in the[ir] argument," and it agreed to give a jury instruction regarding coerced confessions.

¶28   The district court's third relevant pretrial ruling involved its decision to bar potential defense witnesses unless the defense disclosed their names. The defense argued that anonymity was critical because these potentially exculpatory witnesses would not come forward, or would change their stories, if their names were revealed outside of the courtroom. The State argued that such a prohibition would prevent proper investigation of the witnesses' stories. The district court ruled that "if these [witnesses] are not willing to give their identity to the prosecutors and the law enforcement [to] follow up on what they are going to say, then they are not going to testify." After the court's ruling, the defense chose not to disclose the names of the potential witnesses and did not call them at trial.

¶29   The jury found Mr. Perea guilty as charged. At the sentencing hearing, the district court identified several aggravating and mitigating circumstances, and found that "the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt." It sentenced Mr. Perea to LWOP for each

---

[1] *See State v. Rettenberger*, 1999 UT 80, ¶¶ 22–23, 31, 984 P.2d 1009; *State v. Mauchley*, 2003 UT 10, ¶¶ 21, 27 n.3, 53–54, 56, 67 P.3d 477.

aggravated murder count and three years to life for each attempted murder count. Mr. Perea timely appealed.

¶30 We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(i).

## STANDARD OF REVIEW

¶31 We review the district court's decision to exclude expert witness testimony for an abuse of discretion. *Eskelson ex rel. Eskelson v. Davis Hosp. & Med. Ctr.*, 2010 UT 59, ¶ 5, 242 P.3d 762; *State v. Clopten*, 2009 UT 84, ¶ 6, 223 P.3d 1103. The district court has "wide discretion in determining the admissibility of expert testimony." *State v. Hollen*, 2002 UT 35, ¶ 66, 44 P.3d 794 (internal quotation marks omitted). Therefore, "we disturb the district court's decision to strike expert testimony only when it exceeds the limits of reasonability." *Eskelson*, 2010 UT 59, ¶ 5 (internal quotation marks omitted). But if the district court errs in its interpretation of the law or the application of the law to the facts, "it [does] not act within the limits of reasonability, and we will not defer to the evidentiary decision." *Id.*

¶32 Similarly, we give the district court "broad discretion to admit or exclude evidence," including lay witness testimony, "and will disturb its ruling only for abuse of discretion." *Daines v. Vincent*, 2008 UT 51, ¶ 21, 190 P.3d 1269; *see also Taylor v. Illinois*, 484 U.S. 400, 415 (1988) (affirming the trial court's preclusion of witness testimony as a sanction for a discovery violation).

¶33 A district court's "ruling on a motion to suppress is reviewed for correctness, including its application of the law to the facts." *State v. Tripp*, 2010 UT 9, ¶ 23, 227 P.3d 1251. We review the district court's factual findings for clear error. *Save Our Schools v. Bd. of Educ.*, 2005 UT 55, ¶ 9, 122 P.3d 611. We will only find clear error if the court's factual findings "are not adequately supported by the record, resolving all disputes in the evidence in a light most favorable to the trial court's determination." *Id.* (internal quotation marks omitted).

¶34 Mr. Perea's cumulative error claim requires that we first apply "the standard of review applicable to each underlying claim of error." *Radman v. Flanders Corp.*, 2007 UT App 351, ¶ 4, 172 P.3d 668. After assessing Mr. Perea's underlying claims, we will reverse "under the cumulative error doctrine only if the cumulative effect of the several errors undermines . . . confidence that a fair trial was had." *State v. Killpack*, 2008 UT 49, ¶ 54, 191 P.3d 17 (internal

quotation marks omitted). But, if Mr. Perea's claims do not constitute error, or if the cumulative effect of any errors does not undermine our confidence in the verdict, we will not apply the doctrine. *See id.*

¶35 Mr. Perea's challenge to his sentence of LWOP involves statutory and constitutional interpretation. We therefore review the district court's decision "for correctness, and we provide no deference to the district court's legal conclusions." *State v. Poole*, 2010 UT 25, ¶ 8, 232 P.3d 519.

## ANALYSIS

¶36 Mr. Perea argues that the district court erred in: (1) limiting the testimony of the defense's crime scene reconstruction expert, (2) excluding the testimony the defenses's false confession expert, (3) precluding the testimony of potentially exculpatory witnesses, and (4) denying the defense's motion to suppress Mr. Perea's confession. Mr. Perea argues that, taken together, these errors constituted cumulative error and "effectively den[ied] Mr. Perea a fair trial." Mr. Perea further argues that his sentence of LWOP is unconstitutional. Finally, Mr. Perea urges us to judicially require the recording of all station house confessions.

¶37 We first address each of Mr. Perea's asserted errors and then turn to his cumulative error argument. We next discuss Mr. Perea's argument that his sentence of LWOP is unconstitutional. Finally, we turn to Mr. Perea's argument that we should judicially mandate the recording of station house confessions.

## I. THE DISTRICT COURT ERRED IN LIMITING THE TESTIMONY OF JAMES GASKILL

¶38 Mr. Perea argues that the district court erroneously excluded the testimony of James Gaskill, the defense expert on crime scene reconstruction. Mr. Gaskill visited the scene, took measurements, and determined that there "were multiple shooters[,] . . . that the bullet casing pattern did not seem consistent with the State's version of events, [and] that it would be difficult, if not impossible, for [Mr. Perea] to hit the[] victims according to the State's theory." While the district court allowed Mr. Gaskill to testify to his investigation and theory, it did not allow him to directly comment on the credibility of the State's witnesses, or utilize photographic and animated evidence in support of his testimony.

¶39 We hold that the district court did not err when it prevented Mr. Gaskill from commenting on the veracity of other

witnesses and when it refused to admit his proffered photographs. But the district court did abuse its discretion when it refused to admit the computer animations in support of Mr. Gaskill's testimony.

### A. *The District Court Did Not Err when It Precluded Mr. Gaskill From Directly Commenting on the Credibility of the State's Witnesses*

¶40 "[W]e allow experts latitude to interpret the facts before them," even when that interpretation contradicts that of another witness. *Eskelson ex rel. Eskelson v. Davis Hosp. & Med. Ctr.*, 2010 UT 59, ¶ 16, 242 P.3d 762. But we do not allow "an expert's testimony as to the truthfulness of a witness on a particular occasion." *State v. Rimmasch*, 775 P.2d 388, 392 (Utah 1989) (citing rule 608 of the Utah Rules of Evidence for the proposition that witnesses may not normally testify regarding "specific instances of [another] witness's conduct in order to attack or support the witness's character for truthfulness"). Because "the resolution of credibility [is] for the fact-finder [alone]," it is not a proper subject on which an expert witness may opine. *State v. Hoyt*, 806 P.2d 204, 211 (Utah Ct. App. 1991).

¶41 While our rules of evidence allow Mr. Gaskill to present theories that contradicted the testimony of other witnesses, our rules do not allow him to comment directly on the veracity of those witnesses. *See Eskelson*, 2010 UT 59, ¶ 17. We therefore hold that the district court did not err when it prohibited Mr. Gaskill from testifying as to the truthfulness of the State's witnesses.

### B. *The District Court Did Not Err When It Excluded Mr. Gaskill's Crime Scene Photographs*

¶42 Before evidence may be admitted, its proponent is required to establish a proper foundation. Rule 402 of the Utah Rules of Evidence requires that evidence must be relevant to be admitted. Rule 901(a) requires that an exhibit must be authenticated and that "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Where an exhibit is not representative of what its proponent claims it represents, a court does not abuse its discretion when it refuses to admit the exhibit. *See State v. Horton*, 848 P.2d 708, 714 (Utah Ct. App. 1993). And even if an exhibit is both relevant and authenticated, rule 403 allows the district court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

¶43   Here, the defense sought to introduce photographs taken by Mr. Gaskill that he claimed represented the crime scene. The State objected, arguing that the photographs did not accurately represent the scene on the night of the shooting. Though the photographs were based on actual crime scene photographs, Mr. Gaskill admitted that there were many differences between his photographs and the scene on the night of the shooting. He admitted that the photos purporting to show Mr. Perea's view from the SUV could not be accurate because the appropriate make and model SUV was not used. He further admitted that a pickup truck in one of the photographs was not the same make or model as the truck parked there on the night of the shooting. Finally, Mr. Gaskill admitted that he was not certain if a car in one of the photographs was in the same location as it had been on the night of the shooting.

¶44   Mr. Gaskill's admissions create significant doubt as to the accuracy and relevance of the photographs. Particularly where the defense's theory was contingent on the location and size of the vehicles involved, the inaccurate use of substitute vehicles had the potential to unfairly prejudice or mislead the jury or to confuse the issues. *See* UTAH R. EVID. 403. Therefore, the district court did not abuse its discretion when it refused to admit the inaccurate and potentially misleading photographs.

*C. The District Court Erred When It Excluded Mr. Gaskill's Computer-Generated Animations*

¶45   The defense attempted to introduce two computer-generated animations to visually represent Mr. Gaskill's testimony. Mr. Gaskill testified that although he did not personally create the animations, they "g[a]ve an indication of what [he] believe[d] may have happened" and would make it easier for the jury to understand his testimony. The State objected and the district court refused to admit the animations, finding that "there [was] no foundation for the animation[s]" because Mr. Gaskill did not know "who created [them]," "the background of the people who created [them]," "how [they were] created," or "what [the animators] relied upon in creating [them]." We hold that the district court applied an erroneous legal standard in refusing to admit the animations.

¶46   Broadly speaking, all evidence can be categorized as either substantive or demonstrative. *See* Steven C. Marks, *The Admissibility and Use of Demonstrative Aids*, 32 A.B.A. THE BRIEF 24, 25 (2003). Demonstrative evidence is evidence that is meant only to illustrate a witness's testimony. *Id.* It carries no independent probative value

in and of itself, but aids a jury in understanding difficult factual issues. *Id.* Common examples of demonstrative evidence include models, charts, and timelines.

¶47 On the other hand, substantive evidence is "offered to help establish a fact in issue." BLACK'S LAW DICTIONARY 640 (9th ed. 2009). In other words, relevant "[substantive] evidence directly affects the perceived likelihood that a fact of consequence has occurred" whereas the "effect of demonstrative evidence is to help clarify and make more understandable a piece of substantive proof." Robert D. Brain & Daniel J. Broderick, *The Derivative Relevance of Demonstrative Evidence: Charting Its Proper Evidentiary Status*, 25 U.C. DAVIS L. REV. 957, 967 (1992). Common examples of substantive evidence include eyewitness testimony, ballistic reports, and security camera footage.

¶48 Because rule 901(a) of the Utah Rules of Evidence requires that "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is," the distinction between substantive and demonstrative evidence is critical to understanding the foundational burden imposed on the evidence's proponent. If the evidence is merely demonstrative, then the proponent claims only that the proffered demonstrative evidence accurately illustrates the testimony given and rule 901 is satisfied so long as there is sufficient evidence to support the claim that it accurately depicts a witness's testimony as well as any uncontested relevant facts.[2] Alternatively, in the case of substantive evidence, there must be some showing that the evidence itself supports the proffered conclusion.[3]

¶49 Computer-generated evidence is simply a subset of general evidence and the categories of computer-generated evidence correspond with the two general categories of evidence. A "com-

---

[2] Prior cases have held that demonstrations and reenactments require substantially similar conditions. *See, e.g., Whitehead v. Am. Motors Sales Corp.*, 801 P.2d 920, 923 (Utah 1990). This substantial similarity requirement is properly applied to the *undisputed facts* and proponent's own testimony. We have never held that such evidence must be substantially similar to the opponent's version of *disputed facts*.

[3] The type of support required will vary depending on the nature of the substantive evidence. *See* R. COLLIN MANGRUM & DEE BENSON, MANGRUM & BENSON ON UTAH EVIDENCE, 802–23 (2012).

puter animation" demonstrates a witness's testimony and is therefore a subset of demonstrative evidence. *See* Kurtis A. Kemper, Annotation, *Admissibility of Computer-Generated Animation*, 111 A.L.R. 5th 529 § 2b (2003). As such, the witness does not use the computer animation to arrive at his or her conclusions. Rather, the animation is wholly illustrative of the witness's own conclusions drawn from the underlying substantive evidence.

¶50 In contrast, a "computer simulation" is substantive evidence used by the witness in drawing his conclusions.

> [C]omputer-generated simulations are typically recreations of events or experiments based on scientific principles and data; in a simulation, data is entered into a computer, which is programmed to analyze and draw conclusions from the data. Computer simulations are [therefore a type of] substantive evidence offered to support a fact in issue and have independent evidentiary value.

*Id.* (footnotes omitted). Computer simulations do not just illustrate an expert's conclusions but are submitted as substantive evidence with independent probative value. As a subset of substantive evidence, computer simulations must therefore meet a higher threshold showing than that required for demonstrative evidence.

¶51 Because computer animations are merely a subset of demonstrative evidence, it is not necessary that the testifying witness know how the animation was created in order to satisfy rule 901's authenticity requirement. Rather, it is sufficient that the animation accurately reflects the witness's testimony. *See, e.g., Gosser v. Commonwealth*, 31 S.W.3d 897, 903 (Ky. 2000) ("[B]ecause a computer-generated diagram, like any diagram, is merely illustrative of a witness's testimony, its admission normally does not depend on testimony as to how the diagram was prepared, *e.g.*, how the data was gathered or inputted into the computer."), *abrogated on other grounds by Elery v. Commonwealth*, 368 S.W.3d 78 (Ky. 2012). For instance, an expert witness using a plastic model of a human organ is not required to know how the model was created. It is sufficient for the expert to confirm that the model accurately represents the organ about which he is testifying.[4]

---

[4] We recognize, however, that because the "animation represents only a re-creation of the proponent's version of the event," it "should

(continued...)

¶52 Because the animations offered to illustrate Mr. Gaskill's testimony were only visual representations of his opinions, the evidence was demonstrative in nature. It is uncontested that Mr. Gaskill did not know the exact computer processes through which the animations were created. But the court had already found that Mr. Gaskill's testimony about the events depicted in the animations was relevant under rule 401 and it did not exclude the testimony or animations based on prejudice under rule 403.

¶53 The State argues that the animations do not accurately represent the facts because, under the State's theory, there was only one shooter. But this argument misapprehends the burden for admissibility of demonstrative evidence under rule 901. Rule 901 does not require that the demonstrative evidence be uncontroversial, but only that it accurately represents what its proponent claims. Mr. Gaskill confirmed that the animations accurately represented his expert interpretation of the facts. Therefore, the district court erred when it did not admit the animations.

## II. THE DISTRICT COURT ERRED IN BARRING THE TESTIMONY OF DR. OFSHE

¶54 Mr. Perea argues that the district court also erroneously excluded the testimony of Dr. Richard Ofshe, a defense expert who intended to testify regarding false confessions. The district court ruled first that Dr. Ofshe could not testify as to the truthfulness of Mr. Perea's confession. It next questioned whether or not an expert was needed to testify to the phenomena of false confessions and concluded that "a jury of lay people can decide the question as to whether or not a confession is reliable, involuntary, or coerced without having an expert testify on that issue."[5] Finally, the court

---

[4](...continued)
in no way be viewed as the absolute truth." *Clark v. Cantrell*, 529 S.E.2d 528, 537 (S.C. 2000). And we echo the Supreme Court of South Carolina in "encourag[ing] the [district] court to give a cautionary instruction" to the jury that it is not the absolute truth "and, like all evidence, it may be accepted or rejected in whole or in part." *Id.*

[5] We pause to note the distinction between false and coerced confessions. Whether a confession is coerced is a question of law that hinges on the manner in which the confession was obtained. In contrast, whether a confession is false is a question of fact that hinges
(continued...)

found that Dr. Ofshe's methods were not "science" and refused to allow any of his proffered testimony.

¶55   Because we find that any error was harmless, we decline to consider whether the district court erred when it prohibited Dr. Ofshe from directly testifying as to the veracity of Mr. Perea's confession. However, we find the district court did err when it barred Dr. Ofshe from testifying as to the phenomenon of false confessions generally.

*A. Because Any Error Was Harmless, We Decline to Consider Whether the District Court Erred in Prohibiting Dr. Ofshe From Testifying as to the Veracity of Mr. Perea's Confession*

¶ 56   Mr. Perea first argues that the district court erred when it ruled that Dr. Ofshe could not opine on the truthfulness of Mr. Perea's confession. The State disagrees. In arguing as to the propriety of Dr. Ofshe's proffered testimony on this point, both parties frame their arguments around rule 608 of the Utah Rules of Evidence, which prohibits testimony as to a witness's truthfulness on a particular occasion. *See State v. Rimmasch*, 775 P.2d 388, 391 (Utah 1989). However, by its plain language, rule 608 applies only to a *witness's* character for truthfulness. UTAH R. EVID. 608(a) ("A *witness's credibility* may be attacked or supported by testimony about the *witness's* reputation for having a character for truthfulness or untruthfulness . . . ." (emphasis added)). Because Mr. Perea never testified, he was not a witness in this case. Rule 608 is therefore not controlling.

¶57   Although rule 608 is not controlling here, it may be that the policy behind rule 608 is equally applicable to situations like this where a witness offers to testify as to the truthfulness of a non-testifying defendant's out-of-court statement. Indeed, in *Rimmasch*, we relied on rule 608 to disallow expert testimony as to the veracity of a testifying witness's specific out-of-court statement, recognizing the important public policy goal of preventing "trials from being turned into contests between what would amount to modern oath-helpers who would largely usurp the fact-finding function of judge or jury." 775 P.2d at 392. This same public policy goal appears to be implicated in the case of a defendant's out-of-court confession

---

⁵(...continued)
on the veracity of the confession. It is both possible to have a coerced, but true, confession, or a false confession that was not coerced.

when the defendant declines to testify. Thus, it may well be that rule 608's prohibitions should be extended to apply to the out-of-court statements of nontestifying witnesses. However, because the parties to this appeal did not brief this issue, and because we conclude that any error in refusing to admit Dr. Ofshe's testimony is ultimately harmless, *see infra* Section V.A.2, we decline to resolve the issue here.

¶58    Thus, we do not reach the question of whether the district court erred when it prohibited Dr. Ofshe from testifying about the veracity of Mr. Perea's confession.

### B. The District Court Abused Its Discretion When It Refused to Allow Dr. Ofshe to Testify About False Confessions Generally

¶59    Mr. Perea argues that juries do not understand the phenomenon of false confessions and frequently disregard the possibility of a false confession. He also argues that juries do not understand the prevalence of false confessions, the aggressive and persuasive techniques employed by police to elicit confessions from suspects, or other factors that contribute to false confessions. accordingly argues that expert testimony was necessary to assist the jury in evaluating the truthfulness of his confession. The State responds that the district court was well within its discretion to exclude the proposed expert testimony under rules 608(a) and 702(a) of the Utah Rules of Evidence because such testimony constituted a comment on Mr. Perea's credibility, and because the scientific methodology on which Dr. Ofshe relied is unreliable.

¶60    Issues relating to the admissibility of expert testimony regarding the reliability of confessions are similar to those relating to the admissibility of expert testimony regarding the reliability of eyewitness identification testimony that we recently examined in *State v. Clopten*, 2009 UT 84, 223 P.3d 1103. We therefore begin by reviewing our analysis in that case.

### 1. Our Holding in *Clopten* Made Clear That Cautionary Instructions and Cross-Examination Are No Substitute For Expert Testimony

¶61    In February 2006, Deon Clopten was convicted of first-degree murder for the shooting of Tony Fuailemaa outside of a nightclub in Salt Lake City. *Clopten*, 2009 UT 84, ¶ 2. While Mr. Clopten claimed that a man named Freddie White was responsible for the shooting, several eyewitnesses testified that Mr. Clopten was the shooter. *Id.* Without strong physical or forensic evidence, the State relied in large part on the eyewitness testimony to convict Mr. Clopten. *Id.*

¶62 At trial, Mr. Clopten sought to introduce an expert in eyewitness identification, Dr. David Dodd, to testify regarding various factors that affect the accuracy of eyewitness testimony. *Id.* ¶ 3. These factors included "cross-racial identification, the impact of violence and stress during an event, the tendency to focus on a weapon" and the "suggestive nature of certain identification procedures used by police." *Id.* The district court refused to admit the expert testimony, reasoning that it was unnecessary because "potential problems with eyewitness identification could be explained using a jury instruction." *Id.* ¶ 4. The court of appeals deferred to the district court's judgment and upheld Mr. Clopten's conviction. *Id.* ¶ 5. We granted certiorari to review the question of "whether expert testimony regarding the reliability of eyewitness identification should be presumed admissible when timely requested." *Id.* ¶ 6.

¶63 Our analysis in *Clopten* began with a review of *State v. Long*, in which we concluded that "[a]lthough research has convincingly demonstrated the weaknesses inherent in eyewitness identification, jurors are, for the most part, unaware of these problems." 721 P.2d 483, 490 (Utah 1986). In *Long*, we therefore "abandon[ed] our discretionary approach to cautionary jury instructions and direct[ed] that . . . [district] courts shall give such an instruction whenever eyewitness identification is a central issue in a case and such an instruction is requested by the defense." *Id.* at 492.

¶64 Although it was not our intention in *Long* to preclude the admission of expert testimony regarding the infirmities of eyewitness identifications, that was what frequently occurred in practice. Many district courts took the position that a cautionary jury instruction entirely resolved the question of the reliability of eyewitness identifications, and therefore precluded expert testimony on that issue. *Clopten*, 2009 UT 84, ¶ 13. We recognized in *Clopten* that "[t]his trend . . . is troubling in light of strong empirical research suggesting that cautionary instructions are a poor substitute for expert testimony." *Id.* ¶ 14. We then noted that the more recent empirical evidence had conclusively established that the accuracy of eyewitness identification depends upon certain factors. *Id.* ¶ 15. Such factors included the race of the accused and the witness, the amount of time the accused was in view, lighting conditions, distinctiveness of appearance, the use of a disguise, and the presence of weapons or other distracting objects. *Id.* Unfortunately, "juries are generally unaware of these deficiencies . . . and thus give great

weight to eyewitness identifications" even when they are potentially unreliable. *Id.*

¶65   Without expert testimony, a defendant is left with only cross-examination and a cautionary jury instruction to convey the potential shortcomings of an eyewitness identification. We concluded, however, that "[b]oth of these tools suffer from serious shortcomings." *Id.* ¶ 16. We noted that cautionary instructions were only given when requested by the defense and were considered ineffective at educating a jury because they are "given at the end of what might be a long and fatiguing trial . . . buried in an overall charge by the court" and "instructions may come too late to alter the jury's opinion of a witness whose testimony might have been heard days before." *Id.* ¶ 24 (internal quotation marks omitted). And we reasoned that cross-examination, while often able to expose lies or half-truths, is far less effective when witnesses are mistaken but believe that what they say is true. Even if cross-examination could expose the mistake, "[w]ithout the assistance of expert testimony, a jury may have difficulty assessing the import of those factors in gauging the reliability of the identification." *Id.* ¶ 22.

¶66   On the other hand, we concluded that expert testimony "substantially enhance[s] the ability of juries to recognize potential problems with eyewitness testimony." *Id.* ¶ 25. And although the actual number of wrongful convictions from mistaken eyewitness identifications is unknown, the possibility of such a wrongful conviction provided sufficient justification for us to review the implications of our decision in *Long. Id.* ¶ 16 n.7.

¶67   Because we found that the empirical research regarding the limitations of eyewitness identification had matured since our decision in *Long*, we held in *Clopten* that expert testimony regarding eyewitness identifications should be admitted as long as it met the standards set out in rule 702 of the Utah Rules of Evidence. *Id.* ¶ 32. Our expectation was that the "application of rule 702 will result in the liberal and routine admission of eyewitness expert testimony." *Id.* ¶ 30. Although we cautioned that the admission of eyewitness testimony is not mandatory, we warned that "the testimony of an eyewitness expert should not be considered cumulative or duplicative of cautionary instructions to the jury." *Id.* ¶¶ 33–34.

¶68   We then applied our holding to the facts in *Clopten*. We noted that the witnesses "saw the shooter for no more than a few seconds, from some distance away, at night, and while in extreme fear for their own lives"; the shooter's face was disguised; the

shooter was a different race than the witnesses; and the weapon used in the murder may have distracted the witnesses. *Id.* ¶ 46. We concluded that "the circumstances found in the Clopten trial are exactly those under which the testimony of an eyewitness expert is most helpful to a jury." *Id.* ¶ 47. We overruled the court of appeals, vacated the verdict, and remanded for a new trial because there was a "reasonable likelihood that, if allowed to hear Dr. Dodd's testimony, the jury would have questioned the accuracy of the eyewitnesses more rigorously and would not have convicted Clopten." *Id.* ¶ 48.

2. Our Reasoning in *Clopten* Is Directly Applicable to the Use of Expert Testimony with Regard to the Phenomenon of False Confessions

¶69 This case presents issues closely paralleling those we decided in *Clopton*. A confession, much like an eyewitness identification, is more or less reliable based on a number of factors. Unfortunately, however, research has shown that the potential infirmities of confessions are largely unknown to jurors.[6]

¶70 False confessions are an unsettling and unfortunate reality of our criminal justice system. Just as the criminal law is "rife with instances of mistaken identification," *Long*, 721 P.2d at 491 (internal quotation marks omitted), "[i]t is beyond dispute that some people falsely confess to committing a crime that was never committed or was committed by someone else," *State v. Mauchley*, 2003 UT 10, ¶ 21, 67 P.3d 477. And like expert testimony regarding eyewitness identification, expert testimony about factors leading to a false confession assists a "trier of fact to understand the evidence or to determine a fact in issue." UTAH R. EVID. 702(a).

¶71 Recent laboratory-based studies have identified several factors that increase the likelihood of false confessions.[7] Among the factors identified are sleep deprivation, the presentation of false

---

[6] Our analogy to *Clopton* is limited to a recognition that factfinders can benefit from expert testimony relating to counterintuitive phenomena that are dependent on numerous inter-related factors. We make no judgment as to the relative merits of the studies relating to eyewitness identification versus those related to the prevalence of false confessions.

[7] These studies are discussed in greater detail below. *See infra* Section II.B.3.

evidence and use of minimization techniques by questioners, the subject's age and intelligence level, and certain personality traits. Though expert testimony regarding the phenomenon of false confessions would not be appropriate in every case, when such indicia are present, a defendant should be allowed to present expert testimony on the subject.

¶72 Importantly, the shortcomings in the use of cautionary instructions and cross-examination in lieu of expert testimony are even more acute when dealing with potentially false confessions than when dealing with potentially mistaken identifications. Cross-examination of eyewitnesses is routine in all cases. Conversely, the ability to examine the defendant is only possible if he waives his Fifth Amendment protections and testifies in his own case—a situation that is far from routine. To require a defendant to testify regarding the factors that contributed to his alleged false confession, rather than allow the use of an expert witness, opens the defendant up to cross-examination and impinges on his constitutionally guaranteed right against self-incrimination. For these reasons, expert testimony regarding the phenomenon of false confessions should be admitted so long as it meets the standards set out in rule 702 of the Utah Rules of Evidence and it is relevant to the facts of the specific case.

3. Dr. Ofshe's Testimony Satisfied the Requirements for Admissibility Under Rule 702

¶73 The two-part analysis articulated by rule 702 of the Utah Rules of Evidence governs the admissibility of expert witness testimony. "First, the trial judge must find that the expert testimony will 'assist the trier of fact.'" *Clopten*, 2009 UT 84, ¶ 31 (quoting UTAH R. EVID. 702(a)). Second, the party wishing to rely on the expert's testimony must make a threshold showing that "the principles or methods that are underlying in the testimony (1) are reliable, (2) are based upon sufficient facts or data, and (3) have been reliably applied to the facts." UTAH R. EVID. 702(b). We therefore analyze Dr. Ofshe's proffered testimony under these requirements.

a. Dr. Ofshe's proposed testimony would have enabled the jury to evaluate Mr. Perea's claim that he falsely confessed

¶74 Under rule 702(a), proposed expert testimony must "assist the trier of fact." UTAH R. EVID. 702(a). Here, there is no question that Dr. Ofshe's proposed testimony would have assisted the jury in evaluating the reliability of Mr. Perea's confession. Testimony regarding the factors that can lead to false confessions is exactly the

type of evidence that would have helped the jury assess Mr. Perea's claim that he falsely confessed. Such testimony aids a jury in reaching a just verdict because it puts a jury on guard to protect against giving disproportionate weight to confessions where multiple indicia of false confessions are present. In other instances, however, such expert testimony may embolden juries to give more weight to confessions where no such factors are present.

b. The science underlying Dr. Ofshe's proffered testimony is sufficiently developed to satisfy rule 702

¶75 Rule 702 next requires that proposed expert testimony be supported by reliable scientific study and methodology. Utah R. Evid. 702(b). Rule 702 "assigns to trial judges a 'gatekeeper' responsibility to screen out unreliable expert testimony" and cautions that "trial judges should confront proposed expert testimony with rational skepticism." Utah R. Evid. 702 advisory committee's note. But this "threshold showing" requires "only a basic foundational showing of indicia of reliability for the testimony to be admissible, not that the opinion is indisputably correct." *Id.*

¶76 Although a science in its infancy may not meet the reliability standards of rule 702, as it matures, the science may become sufficiently reliable to meet the "basic foundational showing of indicia of reliability for the testimony to be admissible." *Id.* And that is what has happened to the science relating to false confessions. In the 1990s, little research had been conducted on the phenomenon of false confessions and many of the theories relating to it were not sufficiently supported. But more contemporary, laboratory-based studies have since been performed and demonstrate that the science surrounding false confessions now meets the reliability standards of rule 702.

¶77 The State argues that Dr. Ofshe has no reliable scientific evidence to support his conclusions about the factors that influence the rate of false confessions.[8] It argues that Dr. Ofshe's "work is

---

[8] The State additionally argues that "[s]ince Dr. Ofshe and his allies have not been able to determine the rate at which false confessions occur, *a fortiorari*, they have not been able to determine the rate at which any particular feature they identify as a component of a false confession is associated with a false confession." The State's logic is mathematically flawed, however, because it is entirely possible to know that a factor increases, decreases, or has no effect

(continued...)

predicated upon individual case studies of alleged false confession[s]" rather than empirical evidence or laboratory research. The State therefore contends that the defense cannot show that Dr. Ofshe's "principles or methods" were "based upon sufficient facts or data."

¶78   In support of its argument, the State principally relies on Professor Paul Cassell's article, *The Guilty and the "Innocent": An Examination of Alleged Cases of Wrongful Conviction from False Confessions*, 22 HARV. J.L. & PUB. POL'Y 523 (1999). The district court agreed with the State, concluding Dr. Ofshe's proposed testimony did not satisfy rule 702(b) because the false confession cases relied upon by Dr. Ofshe "are not uniformly accepted within the scientific community as being valid false confession cases," and "[t]here is no empirical data or credible research that supports Dr. Ofshe's opinions regarding false confessions."  The district court also explicitly stated that Professor Cassell was "more reliable" than Dr. Ofshe.[9]

¶79   Professor Cassell's article criticizes the lack of empirical evidence in Dr. Ofshe's two original articles.  But it does not speak to the wealth of studies generated in the intervening years that the

---

[8](...continued)
on the underlying rate of false confessions without knowing the underlying rate itself.  A common sense example is that it is possible to know that a car speeds up when the driver steps on the accelerator even if the exact starting or ending speeds are unknown. Therefore it is mathematically incorrect to say that nothing can be known about the way factors influence the likelihood of a false confession without knowing the underlying rate of false confessions.

[9] The district court went beyond the mandate of its gatekeeping role when it engaged in such weighing of competing expert testimony.  A district court does not abuse its discretion when it concludes that expert testimony does not have sufficient foundational support under rule 702—and this conclusion may be based, in part, on a lack of consensus in the field.  But a court exceeds its role when it bars expert testimony because it prefers one theory or researcher over another.  An expert either meets or fails the standards under the rules of evidence.  So-called "dueling experts" are a standard feature of trials in which expert testimony is presented. Rule 702 does not prohibit the admission of two reliable experts who draw opposite conclusions based on the underlying evidence.

defense presented to the district court. Dr. Ofshe's report states that his testimony not only relies on his original two articles, but also on several more recent articles which, in turn, cite to numerous studies performed by many other researchers.[10] These studies are based on empirical data and laboratory research indicating that such factors as sleep deprivation, presentation of false evidence, minimization techniques, age, intelligence level, and personality traits all affect the rate of false confessions.[11] This development of the science of false confessions is substantially similar to the development of the science of eyewitness identifications we considered in *Clopten*.

¶80 While a comprehensive review of the relevant studies is beyond the scope of this opinion, a few of the most important studies will be set forth here. For example, controlled laboratory experiments have proven that sleep deprivation, which may be present in prolonged interrogations, can increase susceptibility to influence and has been shown to increase the rate of false confessions. Saul M. Kassin et al., *Police-Induced Confessions: Risk Factors and Recommendations*, 34 LAW & HUM. BEHAV. 3, 16 (2010). "[S]leep deprivation markedly impairs the ability to sustain attention, flexibility of thinking, and suggestibility in response to leading questions." *Id.*; *see also*, Mark Blagrove, *Effects of Length of Sleep Deprivation on Interrogative Suggestibility*, 2 J. EXPERIMENTAL PSYCHOL.: APPLIED 48 (1996); Yvonne Harrison & James A. Horn, *The Impact of Sleep Deprivation on Decision Making: A Review*, 6 J. EXPERIMENTAL PSYCHOL.: APPLIED 236 (2000).

¶81 Presentation of false evidence is another factor that has been shown to increase the rate of false confessions. Numerous

---

[10] Specifically, his report states: "There are several more recent literature reviews which report research on which I also rely. These reviews include *The Psychology of Interrogation and Confessions* - Gudjonsson, John Wiley, New York 2003; *The Psychology of Confessions* - *Kassin and Gudjonsson in Psychological Science in the Public Interest*, 5, 2004, *The Road to Perdition: Extreme Influence Tactics in the Interrogation Room*, D. Davis and W O'Donahue in O'Donahue and Hollin (eds.), *Handbook of Forensic Psychology*, New York, Basic Books, 2004."

[11] For a list of the independent studies corroborating the existence of these factors see Saul M. Kassin et al., *Police-Induced Confessions: Risk Factors and Recommendations,* 34 LAW & HUM. BEHAV. 3, 14–22 (2010).

studies have demonstrated that the presentation of false evidence renders individuals more vulnerable to manipulation. Kassin et al., *Police-Induced Confessions, supra*, at 14. These studies reveal that the presentation of false information through confederates, witnesses, counterfeit test results, and false physiological feedback can alter the test subjects' visual judgments,[12] beliefs,[13] perceptions of other people,[14] behaviors towards other people,[15] emotional states,[16] self-assessments,[17] and memories for observed and experienced events.[18] Additionally, laboratory experiments have confirmed that the presentation of false evidence can increase the probability that an innocent person confesses.

¶82   In one study, college students were falsely accused of pressing a key on a computer, causing it to crash, after they were instructed to avoid the key. *See* Saul M. Kassin & Katherine L. Kiechel, *The Social Psychology of False Confessions: Compliance,*

---

[12] *E.g.,* Solomon E. Asch, *Studies of Independence and Conformity: A Minority of One Against a Unanimous Majority*, 70 PSYCHOL. MONO-GRAPHS: GEN & APPLIED 1 (1956); MUZAFER SHERIF, THE PSYCHOLOGY OF SOCIAL NORMS (1936).

[13] Craig A. Anderson et al., *Perseverance of Social Theories: The Role of Explanation in the Persistence of Discredited Information*, 39 J. PERSONALITY & SOC. PSYCHOL. 1037 (1980).

[14] Henri Tajfel et al., *Social Categorization and Intergroup Behaviour*, 1 EURO. J. SOC. PSYCHOL. 149 (1971).

[15] ROBERT ROSENTHAL & LENORE JACOBSON, PYGMALION IN THE CLASSROOM: TEACHER EXPECTATION AND PUPILS' INTELLECTUAL DEVELOPMENT (1968).

[16] Stanley Schachter & Jerome E. Singer, *Cognitive, Social, and Physiological Determinants of Emotional State*, 69 PSYCHOL. REV. 379, (1962).

[17] Jennifer Crocker et al., *Social Stigma: The Affective Consequences of Attributional Ambiguity*, 60 J. PERSONALITY & SOC. PSYCHOL. 218 (1991).

[18] Elizabeth F. Loftus, *Planting Misinformation in the Human Mind: A 30-year Investigation of the Malleability of Memory*, 12 LEARNING & MEMORY 361(2005).

*Internalization, and Confabulation*, 7 PSYCHOL. SCI. 125(1996).

> Despite their innocence and initial denials, subjects were asked to sign a confession. In some sessions but not others, a confederate said she witnessed the subject hit the forbidden key. This false evidence nearly doubled the number of students who signed a written confession, from 48% to 94%.

Kassin et al., *Police-Induced Confessions*, *supra*, at 17. Similar studies have replicated this experiment and found similar results even when the subject's confession led to detrimental financial or other consequences. *See, e.g.,* Robert Horselenberg et al., *Individual Differences and False Confessions: A Conceptual Replication of Kassin and Kiechel*, 9 PSYCHOL., CRIME & L. 1(2003); Allison D. Redlich & Gail S. Goodman, *Taking Responsibility for an Act Not Committed: The Influence of Age and Suggestibility,* 27 L. & HUM. BEHAV. 141 (2003). The false confession rate in similar experiments was particularly acute among children and juveniles. *See, e.g.,* Ingrid Candel et al., *"I Hit the Shift-Key and Then the Computer Crashed": Children and False Admissions*, 38 PERSONALITY & INDIVIDUAL DIFFERENCES 1381 (2005).

¶83 Minimization techniques used by police officers have also been shown to increase the rate of false confessions. Using the results from the experiment described above, it was found that remarks that minimized the subjects' culpability significantly increased the false confession rate. Jessica R. Klaver et al., *Effects of Personality, Interrogation Techniques and Plausibility in an Experimental False Confession Paradigm*, 13 LEGAL & CRIMINOLOGICAL PSYCHOL. 71 (2008). In another study, the test subjects were paired with a confederate and given problem solving tasks. Melissa B. Russano et al., *Investigating True and False Confessions Within a Novel Experimental Paradigm*, 16 PSYCHOL. SCI. 481 (2005). They were instructed to work together on some problems and alone on others. *Id.* By design, some of the confederates sought help on a problem that was supposed to be solved alone while others did not. *Id.* at 483. The experimenter would then claim to find similarities in their answers and accuse the subject of cheating. *Id.* When the accusation was accompanied by minimization techniques, the rate of false confessions tripled. *Id.*

¶84 Paradoxically, anecdotal evidence suggests that a defendant's actual innocence may actually increase an individual's susceptibility to manipulation. Kassin et al., *Police-Induced Confessions*, *supra*, at 22–23. The innocent are often more likely to waive

their rights, believing that since they did nothing wrong, they have nothing to hide. *Id.* at 23. This comports with the commonplace, but naive, notion that only the guilty are accused of crimes and only the guilty need attorneys. *Id.*

¶85 We detail these studies not to endorse a particular position on the false confessions literature, but rather to emphasize the proper role of courts as gatekeepers under the rules of evidence. The aforementioned factors and studies are but a portion of the scientifically reliable information on risk factors of false confessions. And the defense presented this information to the district court, either directly through Dr. Ofshe's proposed testimony or through the various articles on which Dr. Ofshe based his intended testimony. Rule 702(b)(2) requires that the district court consider all the relevant indicia of reliability in determining whether a threshold showing has been made. UTAH R. EVID. 702 advisory committee note. Therefore, even if Dr. Ofshe's original two articles lacked the requisite foundation of "sufficient facts or data," the district court could only properly exclude Dr. Ofshe's testimony if it concluded that all the other studies on which the testimony is based also lacked "sufficient facts or data." UTAH. R. EVID. 702(b)(2). At a minimum, the science behind these studies of false confessions is sufficiently developed to meet the threshold of admissibility.

¶86 The district court abused its discretion when it evaluated only the reliability of Dr. Ofshe's two articles and failed to consider the dozens of other studies on which his testimony relied. Just as the science regarding eyewitness identifications has sufficiently matured to allow its routine introduction after *Clopten*, so too has the science regarding false confessions.

## III. THE DISTRICT COURT DID NOT ERR WHEN IT REFUSED TO ALLOW POTENTIAL DEFENSE WITNESSES TO TESTIFY

¶87 Prior to trial, the district court ruled that if the defense was unwilling to provide the State with the names of potentially exculpatory witnesses, the court would not allow those witnesses to testify. Mr. Perea argues that the district court's decision "deprived [him] of an opportunity to present crucial evidence in his defense." The State counters that because "the prosecution, the [district] court, and the public have a vital interest in the integrity of the trial process," the court's decision to make the testimony conditional on the disclosure of the witnesses' names was within the discretion granted to the district court.

¶88 Mr. Perea argues that the Compulsory Process Clause of the Sixth Amendment grants defendants the right to call favorable witnesses, particularly when those witnesses are "material and favorable to his defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). While a defendant's right to call favorable witnesses is a "fundamental element of due process of law," *Washington v. Texas*, 388 U.S. 14, 19 (1967), "[t]he right to present defense witnesses . . . is not absolute," *United States v. Russell*, 109 F.3d 1503, 1509 (10th Cir. 1997). For instance, in *Taylor v. Illinois*, the U.S. Supreme Court affirmed a district court's exclusion of a potentially exculpatory defense witness based on the defense's discovery violation. 484 U.S. 400, 418 (1988). The Court began by stating that "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Id.* at 410. The Court continued, stating:

> The defendant's right to compulsory process is itself designed to . . . [ensure that] judgments [are not] founded on a partial or speculative presentation of the facts. Rules that provide for pretrial discovery of an opponent's witnesses serve the same high purpose . . . [and] minimize[] the risk that a judgment will be predicated on incomplete, misleading, or even deliberately fabricated testimony.

*Id.* at 411–12 (internal quotation marks omitted). The Court's ruling makes clear that a district court's decision to "[e]xclud[e] witnesses for failure to comply with discovery orders, if not an abuse of discretion, does not violate a defendant's Sixth Amendment right to compulsory process." *Russell*, 109 F.3d at 1509.

¶89 Under rule 16(c) of the Utah Rules of Criminal Procedure, "[e]xcept as otherwise provided or as privileged, the defense shall disclose to the prosecutor such information . . . [or] item of evidence which the court determines on good cause shown should be made available to the prosecutor in order for the prosecutor to adequately prepare his case." Because district courts must manage discovery in such a way as to prevent unfair prejudice to either party, they do not abuse their discretion when they exclude witnesses based on a party's failure or refusal to disclose a witness's identity. For instance, in *State v. Maestas* our court of appeals held that the district court did not abuse its discretion when it excluded an alibi witness because the defense had failed to timely notify the prosecution of the witness. 815 P.2d 1319, 1325 (Utah Ct. App. 1991). The court

27

reasoned that disclosure "prevents last minute surprises and enables the prosecution to make a full and thorough investigation of the merits of the defense." *Id.*

¶91 Here, the district court acknowledged concerns regarding potential retaliation against the defense witnesses, and it left open the possibility that it would allow the witnesses to testify under an assumed name or undertake similar protective measures. But, emphasizing its duty "to [ensure] a fair trial," and concluding that the potential witnesses were both relevant and material to Mr. Perea's defense, the district court determined that fairness afforded the State an opportunity to fully investigate the witnesses' stories. Such a decision is not an abuse of discretion when it "prevents last minute surprises and enables the prosecution to make a full and thorough investigation of the merits of the defense." *Id.* We therefore hold that the district court did not err when it excluded the potential defense witnesses.

## IV. THE DISTRICT COURT DID NOT ERR WHEN IT DENIED MR. PEREA'S MOTION TO SUPPRESS HIS CONFESSION

¶92 Mr. Perea next argues that his confession should have been suppressed for a *Miranda* violation. Specifically, Mr. Perea argues that his statement "that he needed to speak with a lawyer first before he came in" was sufficient to anticipatorily invoke his right to counsel. The State argues first that a defendant cannot anticipatorily invoke his right to counsel prior to a custodial interrogation. It next argues that even if an anticipatory invocation of the right is proper, Mr. Perea's statements do not constitute a proper invocation of that right. We agree with the State and therefore hold that the district court did not err when it denied Mr. Perea's motion to suppress his confession.

¶93 The U.S. Supreme Court's landmark decision in *Miranda v. Arizona* prevents the use of incriminating statements "stemming from custodial interrogation of [a] defendant" unless certain procedural safeguards are met. 384 U.S. 436, 444 (1966). Therefore, "[p]rior to any questioning, the person must be warned that he has . . . a right to the presence of an attorney, either retained or appointed . . . [and if] he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." *Id.* at 444–45. In *Edwards v. Arizona*, the Court expanded the scope of Miranda and held that once a custodial suspect has "expressed his desire to deal with the police only through counsel," he cannot be "subject to further

interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. 477, 484–85 (1981).

¶94 Although the Court has not ruled directly on the issue before us, a footnote in *McNeil v. Wisconsin* suggests that the Court would not allow a defendant to anticipatorily invoke his right to counsel. 501 U.S. 171 (1991). The Court stated that while it has

> never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than "custodial inter-rogation" . . . [t]he fact that we have allowed the *Miranda* right to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will allow it to be asserted initially outside the context of custodial interrogation, with similar future effect.

*Id.* at 182 n.3 (citations omitted). Moreover, the Court has repeatedly clarified that a suspect's *Miranda* rights are contingent on his being subject to a custodial interrogation. *See, e.g., Illinois v. Perkins*, 496 U.S. 292, 297 (1990) (stating that *Miranda* is premised on "the interaction of custody and official interrogation"); *Rhode Island v. Innis*, 446 U.S. 291, 299 (1980) ("The concern of the Court in *Miranda* was that the interrogation environment created by the interplay of interrogation and custody would subjugate the individual to the will of his examiner and thereby undermine the privilege against compulsory self-incrimination." (internal quotation marks omitted)); *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977) ("Our decision in *Miranda* set forth rules of police procedure applicable to custodial interrogation." (internal quotation marks omitted)).

¶95 Similarly, this court has stated that the procedural safeguards of *Miranda* apply only when a defendant is in custody. In *State v. Shuman*, we stated that "*Miranda* warnings are required only where a person has been taken into custody or otherwise deprived of his freedom in a significant way." 639 P.2d 155, 157 (Utah 1981). And in *State v. Cruz*, we stated that "the Fifth Amend-ment right to counsel attaches during custodial interrogation, or questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 2005 UT 45, ¶ 43, 122 P.3d 543 (internal quotation marks omitted).

¶96    Here, Mr. Perea's statement "that he needed to speak with a lawyer first before he came in" occurred two days before Mr. Perea was arrested. When he was arrested, police read Mr. Perea his *Miranda* rights, which he then waived. Prior to his interrogation, he was again advised of his *Miranda* rights, and he once again waived those rights. Mr. Perea was once again advised of his *Miranda* rights when he signed the confession and he acknowledged in writing that he was aware of the waiver of his rights.

¶97    Assuming, without deciding, that Mr. Perea's statement two days before his arrest constitutes a request for a lawyer's assistance, such a prospective request would still be subject to waiver. Had Mr. Perea made the same statement at any point during his custodial interrogation, our decision may be different. But that was not the case. And once he was taken into custody, Mr. Perea waived his rights to the assistance of counsel when he consented to the investigators' questioning and confessed to the shootings.

¶98    Because Mr. Perea was advised of and subsequently waived his *Miranda* rights, the district court did not err when it denied Mr. Perea's motion to suppress his confession.

## V.  BASED ON THE OVERWHELMING EVIDENCE OF MR. PEREA'S GUILT, WE HOLD THAT THE DISTRICT COURT'S ERRORS WERE HARMLESS AND THAT THE CUMULATIVE ERROR DOCTRINE DOES NOT APPLY

¶99    Even if the district court did err, we will not reverse if that error was harmless. *See State v. Vargas*, 2001 UT 5, ¶ 48, 20 P.3d 271. "In order to show that the error is harmful, [Mr. Perea] must demonstrate that absent the error, there is a reasonable likelihood of a more favorable outcome for [him], or phrased differently, our confidence in the verdict is undermined." *State v. Medina-Juarez*, 2001 UT 79, ¶ 18, 34 P.3d 187 (internal quotation marks omitted). Similarly, the doctrine of cumulative error is applicable "only if the cumulative effect of the several errors undermines . . . confidence that a fair trial was had." *State v. Gallegos*, 2009 UT 42, ¶ 39, 220 P.3d 136. It is a doctrine used when a single error may not constitute grounds for reversal, but many errors, when taken collectively, nonetheless undermine confidence in the fairness of a trial.

### A. Individually, the District Court's Errors Are Harmless

¶100    We have concluded that the district erred when it limited the testimony of Mr. Gaskill and chose not to admit the proposed

testimony of Dr. Ofshe. But the potential harm of each error must be viewed against the backdrop of the entire body of evidence. And when so viewed, the errors were harmless.

¶101 There was significant testimony from witnesses both inside and outside of the SUV stating that Mr. Perea was the individual who fired shots into the crowd at Mr. Nava's house. Angelo Gallegos and Elias Garcia, both passengers in the SUV and friends of Mr. Perea, testified that Mr. Perea fired shots from the SUV as it pulled away from the party. Similarly, Ms. Valencia, who was standing near the street and knew Mr. Perea, testified that as the SUV pulled away, "I seen [him] over the top, shooting." Two other party guests, Richard Esquivel and Lacey Randall, testified that they saw someone from the passenger side of the SUV lean over the roof and fire towards Mr. Nava's house. And Keri Garcia, who was standing in Mr. Nava's driveway when the shots from the SUV were fired, testified that the shots came only from the direction of the road.

¶102 Additionally, during questioning, Mr. Perea volunteered that the gun he had used was .22 caliber, a fact that the police had not shared with the public. Although the murder weapon was not recovered, police investigators recovered ten expended .22 caliber shell casings in the street in front of Mr. Nava's house, all fired from the same weapon. Likewise, the bullets from Ms. Prieto's and Mr. Navarez's bodies were .22 caliber. No other shell casings were found at the crime scene.

1. The District Court's Exclusion of Mr. Gaskill's Animations Was Harmless

¶103 While the district court excluded Mr. Gaskill's computer-generated animations, it did not exclude his expert testimony on which the animations were based. It allowed him to opine as to his theory that there were multiple shooters and that the location of some of the injuries made it unlikely that Mr. Perea could have made the shots. He was allowed to refer to diagrams depicting the scene and demonstrate the bullet trajectories that gave him concern. And although Mr. Gaskill's theories conflicted with the State's theory and the testimony of many of the State's witnesses, the district court appropriately allowed him to present his theory to the jury.

¶104 After having reviewed both the testimony provided by Mr. Gaskill and his proffered animations, we hold that the exclusion of the animations does not create the "reasonable likelihood of a more favorable outcome for the appellant." *Medina-Juarez*, 2001 UT

79, ¶ 18 (internal quotation marks omitted). The animations were short, provided nothing that Mr. Gaskill did not make clear in his testimony, and used a perspective that was unhelpful in putting Mr. Gaskill's testimony in context. Because Mr. Gaskill was allowed to fully testify as to his multiple-shooter theory and cast doubt on the State's single-shooter theory, the exclusion of the animations does not undermine our confidence in the verdict.

2. The District Court's Exclusion of Dr. Ofshe's Testimony Was Harmless

¶105    We next evaluate any prejudice arising from the erroneous exclusion of Dr. Ofshe's testimony. We begin by noting that the district court did not err in admitting Mr. Perea's confession. Even had the district court allowed Dr. Ofshe to testify, the jury would have been entitled to consider Mr. Perea's confession. Nor did it err in ruling that Dr. Ofshe could not testify as to the veracity of Mr. Perea's confession. Rather, its only error consisted in barring Dr. Ofshe's proffered testimony about the factors that may contribute to false confessions. We find this error to be harmless because of the overwhelming evidence of Mr. Perea's guilt.

¶106    Multiple individuals who knew Mr. Perea testified that he shot into the crowd. Indeed, the defense's theory was not based on Mr. Perea's exclusion from the crime but on a multiple-shooter theory. Thus, the exclusion of testimony that would have merely cast doubt on Mr. Perea's confession does not undermine our confidence in the verdict. Had this been a case like *Clopten*, in which the evidence of guilt was circumstantial and there were significant issues with eyewitness identification, the exclusion of Dr. Ofshe's testimony would be more concerning. In that case, the admission of an unrebutted confession would have the potential to overwhelm any other evidence of innocence. But here, where there was substantial, independent evidence of Mr. Perea's guilt and his primary defense did not necessarily absolve him of the crime, the admission of Dr. Ofshe's proposed testimony was unlikely to change the outcome of the trial.

B. *The District Court's Errors Do Not Constitute Cumulative Error*

¶107    Having concluded that the district court's errors were harmless individually, we now evaluate their cumulative effect on our confidence in the verdict. Cumulative error is applicable in those instances where the district court's collective errors rise to a level that undermine our confidence in the fairness of the proceed-

ings. But that analysis cannot be conducted in a vacuum, ignorant of the other evidence demonstrating guilt.

¶108 The body of evidence established that Mr. Perea was at the crime scene that evening. It left no doubt that he was in the vehicle from which a number of witnesses testified the shots came. Those witnesses, two of whom were present in the vehicle, testified that it was Mr. Perea who fired shots into the crowd at Mr. Nava's house. The two witnesses who were in the SUV, and at least one of whom witnessed the shooting from Mr. Nava's front yard, were personally familiar with Mr. Perea—he was not a nameless, faceless defendant to them. And, Mr. Perea's knowledge of the type of weapon used in the shooting and the physical evidence at the crime scene provides further evidence that the jury could consider in evaluating his guilt. Finally, Mr. Perea's confession was evidence that the jury was entitled to consider.

¶109 When viewed against the eyewitness testimony, the physical evidence, and Mr. Perea's confession, we cannot say that the district court's individual errors rise to the level of cumulative error. Where there is overwhelming evidence that Mr. Perea shot into the crowd, the exclusion of the expert testimony at issue does not undermine our confidence in the overall fairness of the proceedings or the jury's verdict.

## VI. MR. PEREA'S SENTENCE OF LWOP IS CONSTITUTIONAL

¶110 Utah Code section 76-3-207.7 provides that "[a] person who has pled guilty to or been convicted of first degree felony aggravated murder . . . shall be sentenced by the court . . . [to] life in prison without parole or an indeterminate prison term of not less than 25 years and which may be for life."

¶111 Mr. Perea argues that section 76-3-207.7 violates the Utah Constitution and the United States Constitution in a number of ways. First, he argues that the statute is unconstitutionally vague because it authorizes arbitrary and discriminatory enforcement. He next argues that the statute violates the due process and equal protection clauses of the Utah Constitution and the federal constitution and that it runs afoul of the uniform operation of laws provisions of the Utah Constitution. Finally, he argues that his sentence violates the unnecessary rigor provision of the Utah Constitution and the cruel and unusual punishment clause of the federal constitution. We find these arguments unavailing and conclude that section 76-3-207.7 is constitutional on its face and as applied to Mr. Perea.

*A. Utah Code Section 76-3-207.7 Is Not Unconstitutionally Vague*

¶112    Because Utah Code section 76-3-207.7 does not list the factors a sentencing court must consider when deciding whether to impose a sentence of 25 years to life or LWOP, Mr. Perea argues that it is unconstitutionally vague. Unconstitutionally vague laws violate the due process prohibition that no one "may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *United States v. Batchelder*, 442 U.S. 114, 123 (1979) (internal quotation marks omitted). Similarly, a statute may be unconstitutionally vague if written in a way that "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

¶113    In arguing that section 76-3-207.7 is unconstitutionally vague, Mr. Perea cites primarily to cases where courts have overturned statutes that did not adequately explain the criminal act. *See, e.g.*, *City of Chicago v. Morales*, 527 U.S. 41, 64 (1999) (holding that a city's loitering statute was unconstitutionally vague because it gave officers unfettered discretion to criminalize otherwise lawful behavior). Although it is well settled that statutes must clearly articulate the behavior that they proscribe, there are far fewer cases in which vague sentencing guidelines have been overturned. Even so, the U. S. Supreme Court has made clear that "vague sentencing provisions may pose constitutional questions if they do not state with sufficient clarity the consequences of violating a given criminal statute." *Batchelder*, 442 U.S. at 123.

¶114    We conclude that Section 76-3-207.7 does not suffer from such an infirmity. It states clearly that a defendant convicted of non-capital first-degree felony aggravated murder may be incarcerated for a term up to and including the rest of his life. While it also holds out the possibility of a more lenient sentence of 25 years to life, the fact that the sentencing court may choose to impose the more lenient sentence does not render the statute unconstitutional. Sentencing courts have long been afforded broad discretion in sentencing. And when section 76-3-207.7 is read in the context of Utah's sentencing scheme as a whole, we conclude that it provides sufficient guidance to withstand Mr. Perea's facial vagueness challenge. We further conclude that it was not unconstitutionally applied to Mr. Perea.

¶115    District courts have historically been afforded broad discretion when it comes to sentencing. The U.S. Supreme Court has stated:

[Although t]ribunals passing on the guilt of a defen-

> dant always have been hedged in by strict evidentiary procedural limitations . . . both before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law.

*Williams v. New York*, 337 U.S. 241, 246 (1949).[19]

¶116    So long as a statute clearly specifies the maximum allowable penalty, it is not unconstitutional for sentencing judges to exercise their discretion in offering leniency. *See State v. Shelby*, 728 P.2d 987, 988 (Utah 1986) (stating that this court will overturn a sentence that is within the statutorily prescribed range only for an abuse of discretion). For example, sentencing judges may choose to suspend all or part of a sentence. *See* UTAH CODE § 77-18-1(2)(a); *Williams v. Harris*, 149 P.2d 640, 642 (Utah 1944) (noting that "[t]he right to suspend imposition of sentence . . . is a discretionary right"). Even under Utah's indeterminate sentencing scheme, where the actual time served by any particular defendant is determined by the Board of Pardons, sentencing judges are given discretion to sentence a defendant as if he had been convicted of the next lower degree of offense. UTAH CODE § 76-3-402(1).[20] And we can find no authority

---

[19]*See also State v. Shuler*, 780 P.2d 1067, 1069 (Ariz. Ct. App. 1989) (holding that a sentencing court may consider a defendant's "criminal character and history" despite the absence of prior convictions); *State v. Huey*, 505 A.2d 1242, 1245–46 (Conn. 1986) (finding that a sentencing court may consider prior indictments, uncharged allegations, dismissed counts, and acquittals); *Smith v. State*, 517 A.2d 1081, 1083 (Md. 1986) (holding that a sentencing judge may consider "the facts and circumstances of the crime itself and the background of the individual convicted of committing the crime").

[20] Utah Code section 76-3-402(1) provides that if "the court, having regard to the nature and circumstances of the offense of which the defendant was found guilty and to the history and character of the defendant . . . concludes it would be unduly harsh to record the conviction as being for that degree of offense established by statute, the court may enter a judgment of conviction for

(continued...)

to support the notion that a sentencing judge's statutory authority to grant leniency renders a sentencing statute unconstitutional.

¶117 Mr. Perea argues that section 76-3-207.7 is impermissibly vague because it does not specify the particular items the sentencing court must consider in deciding which of the two possible sentences to impose. We are unpersuaded. Section 76-3-207.7 must be read in the context of Utah's sentencing scheme as a whole. To give full effect to the Legislature's intent, we construe statutes in harmony "with other statutes under the same and related chapters." *Lyon v. Burton*, 2000 UT 19, ¶ 17, 5 P.3d 616. And, when read in context, the statutory scheme provides adequate guidance to sentencing courts. Utah Code section 76-1-104 provides that "[t]he provisions of [the criminal] code shall be construed . . . [to p]revent arbitrary or oppressive treatment . . . [and to p]rescribe penalties which are proportionate to the seriousness of offenses and which permit recognition o[f] differences in rehabilitation possibilities among individual offenders." Section 76-1-106 reinforces section 76-1-104 by providing that "[a]ll provisions of this code and offenses defined by the laws of this state shall be construed . . . to effect the objects of the law and general purposes of [s]ection 76-1-104." When read in harmony, these provisions make clear that a sentencing court is to consider all the evidence before it—the totality of the circumstances—in imposing a sentence that is proportionate to the crime and the culpability of the defendant.

¶ 118 The notion that a sentencing court consider the totality of the circumstances in determining a proportionate sentence is also supported by our evidentiary rules. Rule 1101(c) of the Utah Rules of Evidence provides that our evidentiary rules do not apply during sentencing, opening the door to the court's evaluation of a variety of factors. *See also State v. Sanwick*, 713 P.2d 707, 708 (Utah 1986) (A sentencing court "must be permitted to consider any and all information that reasonably may bear on the proper sentence for the particular defendant, given the crime committed." (quoting *Wasman v. United States*, 468 U.S. 559, 563 (1984)). Because our rules do not constrain the introduction of any evidence tending to inform the court's determination, it is not incumbent upon the statute to enumerate the factors the sentencing judge may or must consider.

---

[20](...continued)
the next lower degree of offense and impose sentence accordingly."

¶119     Indeed, it has only been in capital cases that we have required an explicit weighing of aggravating and mitigating factors. *See, e.g.*, *State v. Lafferty*, 2001 UT 19, ¶ 130, 20 P.3d 342 (reiterating the district court's obligation to weigh the mitigating and aggravating circumstances in a capital case); *State v. Holland*, 777 P.2d 1019, 1027 (Utah 1989) (stating that the "first step" in a capital sentencing evaluation is "to determine whether the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt"); *State v. Wood*, 648 P.2d 71, 83 (Utah 1982) (holding that the capital sentencing standards "require that the sentencing body compare the totality of the mitigating against the totality of the aggravating factors"). Absent statutorily articulated aggravating and mitigating circumstances in noncapital cases, courts have historically based their sentencing decisions on the totality of the circumstances. *See, e.g.*, *State v. Killpack,* 2008 UT 49, ¶ 59, 191 P.3d 17 (stating that "courts must consider all legally relevant factors in making a sentencing decision"); *State v. McClendon*, 611 P.2d 728, 729 (Utah 1980) ("A sentence in a criminal case should be appropriate for the defendant in light of his background and the crime committed and also serve the interests of society which underlie the criminal justice system.").

¶120     And that is exactly what the district court did here. Specifically, the district court found that Mr. Perea's relative youth, his poor educational background, and his borderline IQ/learning disability constituted mitigating factors. But the district court found that there were a wealth of aggravating factors to offset these considerations, including the multiple young victims, the fact that Mr. Perea fired ten shots into a large group of partygoers, and Mr. Perea's lengthy prior criminal record.

¶121     Because district courts are "in the best position to ensure that justice is done and to determine whether any '[o]ne factor in mitigation or aggravation [should] weigh more than several factors on the opposite scale,'" they are "allowed a great deal of discretion in determining the relative weight of competing aggravating and mitigating circumstances." *State v. Moreno*, 2005 UT App 200, ¶ 9, 113 P.3d 992 (alteration in original) (quoting *State v. Russell*, 791 P.2d 188, 192 (Utah 1990)). And as here, where the district court considered the totality of the circumstances and explicitly weighed the mitigating and aggravating factors, we are not persuaded that it abused its discretion or applied the statute in an unconstitutional fashion.

*B. Mr. Perea's Argument That Utah Code Section 76-3-207.7 Violates the Due Process Protections of the Utah and United States Constitutions Is Inadequately Briefed*

¶122    Mr. Perea next argues that section 76-3-207.7 violates the due process protections contained within the Utah and United States Constitutions. While he cites to relevant constitutional provisions, he provides absolutely no analysis as to how those provisions render his sentence unconstitutional. Because an issue is inadequately briefed "when it merely contains bald citation[s] to authority [without] development of that authority and reasoned analysis based on that authority," *Smith v. Four Corners Mental Health Center, Inc.*, 2003 UT 23, ¶ 46, 70 P.3d 904 (alteration in original) (internal quotation marks omitted), we decline to address Mr. Perea's assertion that section 76-3-207.7 violates his due process rights.

*C. Utah Code Section 76-3-207.7 Does Not Violate the Uniform Operation of Laws Provision*

¶123    Mr. Perea argues that section 76-3-207.7 violates the uniform operation of laws provision of the Utah Constitution. Article 1, section 24 of the Utah Constitution requires that "[a]ll laws of a general nature shall have uniform operation." Under the uniform operation of laws provision, a statute must be "uniform on its face." *State v. Mohi*, 901 P.2d 991, 997 (Utah 1995). Further, it "is critical that the *operation* of the [statute] be uniform," such that similarly situated people are treated similarly under the statute. *Id.* (emphasis in original).

¶124    Our analysis under the uniform operation of laws provision requires that we first "determine what classifications, if any, are created by the statute." *Id.* We must then analyze "whether different classes or subclasses are treated disparately. Finally, if any disparate treatment exists between classes or subclasses, we must determine whether the legislature had any reasonable objective that warrants the disparity." *Id.* Mr. Perea asserts that section 76-3-207.7 divides the general class made up of those found guilty of aggravated murder into two subclasses based on the sentence imposed by the district court. He then asserts that the disparate treatment between those sentenced to 25 years to life and those sentenced to LWOP is not justified because the statute fails to provide guidance to the district court.

¶125    We disagree. Not all those found guilty of aggravated murder are similarly situated. While all are found guilty of the same crime, each case and each defendant presents a different set of facts

and a different combination of aggravating and mitigating factors. The discretion afforded to district courts furthers the legitimate legislative purpose of sentencing offenders based on the totality of the unique circumstances present in each case. District courts are authorized and empowered by the Legislature to review the totality of the circumstances before imposing a sentence. Therefore, because the discretion given to district courts therefore furthers the legitimate legislative purpose of sentencing offenders based on the severity of their particular circumstances, we hold that section 76-3-207.7 does not violate our uniform operation of laws provision.

### D. Mr. Perea's Sentence Does Not Violate the Unnecessary Rigor Provision of the Utah Constitution

¶126 Mr. Perea argues that his sentence of LWOP violates Utah Constitution's unnecessary rigor provision because it fails to take into account his "age, mental disabilities and IQ." But Mr. Perea misapprehends the application of the unnecessary rigor provision. That provision protects prisoners from "the imposition of circumstances . . . during their confinement that demand more of the prisoner than society is entitled to require." *Dexter v. Bosko*, 2008 UT 29, ¶ 17, 184 P.3d 592. It therefore applies only to the conditions of one's confinement and does not speak to the proportionality of the particular sentence imposed. The unnecessary rigor provision is therefore not implicated by the imposition of his sentence of LWOP.

### E. Mr. Perea's Sentence Does Not Constitute Cruel and Unusual Punishment Under the United States Constitution

¶127 Finally, Mr. Perea argues that his sentence violates the Eighth Amendment to the United States Constitution, which prohibits cruel and unusual punishments. He argues that his relatively young age, coupled with his low IQ, militates against a sentence of LWOP. In support of his argument, Mr. Perea cites to the Supreme Court's holdings in *Roper v. Simmons*, 543 U.S. 551, 574 (2005) (holding that juveniles, those persons under eighteen years of age, cannot be sentenced to death); *Graham v. Florida*, 560 U.S. 48, ___ (2010) (holding that the Eighth Amendment prohibits a sentence of LWOP for juvenile non-homicide offenders); and *Atkins v. Virginia*, 536 U.S. 304, 318 (2002) (holding that persons with an IQ below 70 cannot be executed because such individuals are too mentally impaired to "understand and process information, to communicate . . . to engage in logical reasoning, [and] to control impulses").

¶128 But the holdings of these cases are inapplicable to the present case. *Roper* does not control because Mr. Perea was neither sentenced to death[21] nor a juvenile offender at the time of the shootings. It is uncontested that Mr. Perea was nineteen years old at the time of the shootings and he was sentenced only to LWOP. Similarly, the Court's holding in *Graham* is inapplicable because Mr. Perea was not found guilty of a non-homicide crime, but was found guilty of aggravated murder arising from the death of two individuals. Finally, it is uncontested that although Mr. Perea has been diagnosed with a low IQ, his score of 77 puts him above the line drawn by the Supreme Court in *Atkins*.

¶129 In spite of the differences between Mr. Perea and the defendants sentenced in *Roper*, *Graham*, and *Atkins*, the district court was authorized to evaluate the totality of the circumstances and could have chosen to impose a less severe sentence. It did not, however, based on its weighing of the aggravating and mitigating circumstances present in this case. And in the absence of a statutory mandate or compelling factual circumstances indicating the district court erred, we will not second-guess the district court, which is "in the best position to ensure that justice is done." *Moreno*, 2005 UT App 200, ¶ 9. We therefore hold that Mr. Perea's sentence is not unconstitutional under the Cruel and Unusual Punishment Clause of the federal constitution.

## VII. MR. PEREA'S CLAIM THAT ALL STATION-HOUSE CONFESSIONS SHOULD BE RECORDED DOES NOT CONSTITUTE GROUNDS FOR REVERSAL

¶130 Finally, we turn to Mr. Perea's argument that we should require the police to record all confessions given at police stations. Mr. Perea argues that recording station-house confessions aids the fact finder in ascertaining the truth and that the absence of a recording makes it difficult to assess the voluntariness of a confession. The State concedes that "an electronic recording requirement would have benefits," but argues the determination of this issue is better left to a legislative body. While we have concerns about the

---

[21] *See Solem v. Helm*, 463 U.S. 277, 289–90 (1983) ("It is true that the penalty of death differs from all other forms of criminal punishment, not in degree but in kind. As a result, our decisions [in] capital cases are of limited assistance in deciding the constitutionality of the punishment in a noncapital case." (alteration in original) (internal quotation marks omitted)).

Ogden Police Department's policy of not recording interrogations or confessions, this appeal is not the appropriate context for addressing those concerns.

¶131 Although Mr. Perea goes on at great length about the necessity of recording a suspect's confession, he concedes that such recordings are not required by the Utah Constitution or our case law.[22] Nor does Mr. Perea explain how a ruling in his favor on this issue would change the outcome of his appeal. Rather, Mr. Perea argues that this court "*should* require" the recording of station-house confessions—a prospective ruling that would not impact the investigators' decision not to record the confession in this case.

¶132 Because there was no constitutional, statutory, or common law obligation for the investigators to record Mr. Perea's confession, and because any ruling that law enforcement should record interrogations in the future would have no effect on the case before us, we decline Mr. Perea's invitation to judicially pronounce a requirement that investigators record station-house confessions. Nevertheless, the benefits of recording station-house confessions are worth considering,[23] especially when viewed in light of current

---

[22] *See State v. Villarreal*, 889 P.2d 419, 427 (Utah 1995) (concluding that the recording of confessions is not required by the Utah Constitution).

[23] Such benefits include "avoiding unwarranted claims of coercion," preventing the use of "actual coercive tactics by police," and demonstrating "the voluntariness of the confession, the context in which a particular statement was made, and . . . the actual content of the statement." *State v. James*, 858 P.2d 1012, 1018 (Utah Ct. App. 1993) (internal quotation marks omitted). The recording of confessions provides clear evidence of coercion or a lack of coercion and assists the fact-finder in determining a confession's voluntariness. Furthermore, such recordings protect police officers and departments from false claims of coercion and misconduct. In the past, there were serious technical and cost barriers to recording confessions. But such concerns have been largely ameliorated by technology. The necessary equipment is not cost prohibitive and is standard equipment on almost every cell phone. When police officers refuse to record interrogations and confessions despite the presence of recording equipment, the State runs the risk that the fact-finder will draw the natural inference that the officers have at-

(continued...)

technological advances and the Attorney General's recommendations in favor of recording.[24] These potential benefits, along with possible arguments against recording station-house confessions, are most appropriately addressed in the first instance by our Advisory Committee on the Rules of Evidence, within which the relative merits of mandating a recording requirement can be fully debated.

## CONCLUSION

¶133 The district court did not err when it denied Mr. Perea's motion to suppress his confession because, even if his ambiguous statement made two days before he was taken into custody was sufficient to constitute an invocation of his right to counsel under the Sixth Amendment, Mr. Perea thereafter voluntarily waived his right to counsel. Similarly, the district court did not err when it barred the testimony of potentially exculpatory witnesses whom the defense would not identify

¶134 Although the district court did err when it limited and excluded the testimony of the defense's expert witnesses, we conclude these errors were harmless. Similarly, the combined result of these errors does not undermine our confidence in the verdict. We also find that section 76-3-207.7 is not unconstitutional and thus affirm Mr. Perea's sentence. Finally, the arguments for and against a requirement to record station-house confessions are more appropriately addressed through the administrative process.

JUSTICE DURHAM, concurring:

¶135 I concur fully in the reasoning and the result of the majority opinion. I only write separately to express my views

---

[23](...continued)
tempted to hide some aspect of the interrogation, even when there are no ill intentions.

[24] In 2008, the Utah Attorney General's Office, in cooperation with statewide law enforcement organizations, drafted a statement for law enforcement that recommends electronic recording of custodial interviews and gives guidelines for doing so. Contrary to those recommendations, Ogden police department policy dictates that officers are not to electronically record interrogations or confessions. Despite the fact that the room in which Mr. Perea was questioned was equipped to record (and an officer actually watched a live feed), no effort was made to record his interrogation and subsequent confession.

regarding the Ogden Police Department's policy not to record station-house interrogations or confessions—despite having the means to do so. At the present time, I am persuaded that recording confessions can only further the interests of justice by enhancing a court's ability both to safeguard important Sixth Amendment protections and to detect false claims of improper police coercion. *See supra* ¶ 132 n.23. Due to these benefits, I believe that we should adopt an evidentiary rule requiring station-house interrogations to be recorded. I do not object to the referral of the question to our rules advisory committee for study and recommendations, but note that on the present state of the evidence and policy considerations regarding this question, the arguments for a rule appear strong.

JUSTICE LEE, concurring:

¶136 I agree with and concur in the court's opinion and disposition of this case, including its determination not to opine on the "advisability" of issuing a rule regarding station-house interrogations. *Supra* ¶ 132. As the majority opinion explains, we are in no position to weigh in on this matter, as there is no law currently requiring recording of such interrogations and "a prospective ruling . . . would not impact the investigators' decision not to record the confession in this case." *Supra* ¶ 131.

¶137 In my view that should be the end of the matter. If we are to leave it to our Advisory Committee on the Rules of Evidence to address this question "in the first instance," *supra* ¶ 132, we should not get ahead of the committee by weighing in through our opinions in this case. Thus, I would not express the view "that recording confessions can only further the interests of justice," or endorse the position "that we should adopt an evidentiary rule requiring station-house interrogations to be recorded." *Supra* ¶ 135 (Durham, J., concurring).

¶138 First, we have no authority to adopt a rule, of evidence or otherwise, "requiring station-house interrogations to be recorded." *Supra* ¶ 135. Our supervisory rulemaking authority extends only to matters of evidence and procedure. *See* Utah Const., art VIII, § 4 ("The Supreme Court shall adopt rules of procedure and evidence to be used in the courts of the state and shall by rule manage the appellate process."). It does not encompass the power to direct the operations of law enforcement.

¶139 Second, although we conceivably could adopt a rule deeming unrecorded stationhouse confessions inadmissible under

the law of evidence, I do not think we have sufficient perspective on the matter to opine on the wisdom of such a rule at this juncture. Certainly there would be upsides to a rule foreclosing the admissibility of unrecorded confessions, as acknowledged above. *See supra* ¶ 132. But I have no idea whether the benefits of such a rule are "strong," *supra* ¶ 135, much less whether they might outweigh any of the various costs or downsides of that approach (none of which have been presented to us on this appeal, but surely will be considered by our advisory committee in due course).

¶140 Finally, the devil is undoubtedly in the details here. The decision whether to adopt a rule of evidence should of course be informed by the nature and content of any proposed rule. Such a rule, moreover, would almost certainly have to be subject to exceptions set forth in any proposed rule. And unless and until we have the proposed text in front of us, I see no basis for an advisory thumb on the scale in its favor. I would accordingly await the results of our advisory committee process instead of weighing in in advance.

———————